1

2

3

4                    UNITED STATES DISTRICT COURT

5                         DISTRICT OF NEVADA

6    WESS DEASE,                          3:13-cv-00424-MMD-WGC

7                          Plaintiff,     **REPORT & RECOMMENDATION OF**
                                          **U.S. MAGISTRATE JUDGE**
8          v.

9    MICHAEL KOEHN, et. al.,

10                        Defendants.

11

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Plaintiff's Motion for Summary Judgment. (ECF No. 59, 66.)[1] Defendants filed a response.

16   (ECF No. 65.) Also before the court is Defendants' Cross-Motion for Summary Judgment. (ECF

17   No. 61.) Plaintiff filed a response (ECF Nos. 66, 68, 69, 70, 71) and Defendants filed a reply

18   (ECF No. 74.) Plaintiff filed a sur-reply, which is also a reply in support of his motion. (ECF No.

19   75.)

20          After a thorough review, the court recommends that Plaintiff's motion be denied, and that

21   Defendants' cross-motion be granted.

22                              **I. BACKGROUND**

23          Plaintiff is an inmate incarcerated within the Nevada Department of Corrections

24   (NDOC). (Pl.'s Am. Compl., ECF No. 11.) He is proceeding pro se in this action brought

25   pursuant to 42 U.S.C. § 1983. (*Id.*) The events giving rise to this action took place while Plaintiff

26

27   ──────────────

28          [1] Refers to court's electronic case filing (ECF) number. ECF No. 66 contains medical records submitted in
     support of Plaintiff's motion.

was housed at Ely State Prison (ESP). (*Id.*) Defendants are Dr. Michael Koehn, Dawn Jones, Ned Schuering[2], Charles Schardin[3] and Jon Garner. (*Id.*)

Plaintiff's Amended Complaint is proceeding on the following claims: (1) a claim in Count I that defendants Dr. Koehn and nurses Jones and Schuering were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment; (2) a claim in Count II that his rights under the Fourteenth Amendment's Equal Protection Clause were violated by defendants Jones, Dr. Koehn, Schuering and Schardin ; (3) a supervisory liability claim in Count III against defendants Jones, Schardin and Garner. (*Id.*; ECF No. 50 at 2-3.)

Plaintiff alleges that he began to lose weight in 2006 as a result of a medical condition (sarcoidosis), and asked Dr. Gedney for double portions in January 2007. (ECF No. 11 at 3.) Six years passed, and Plaintiff's weight remained at 189 pounds, but in August 2012, he began to lose weight again as a result of steroids he was taking. (*Id.*) He lost thirteen pounds, and was down to 176 pounds. (*Id.*) He informed Dr. Koehn of his weight loss, and asked for double portions of food, and was denied. (*Id.*) He repeated his requests, which were denied, and his weight dropped to 169 pounds over the course of several months. (*Id.*) Plaintiff was seen by Schuering on March 1, 2013, where he weighed 169 pounds and was measured at 6 feet, three inches tall. (*Id.* at 4.) He was shown a BMI chart which showed that a person of Plaintiff's height and weight was normal. (*Id.*) Plaintiff believed the chart was wrong. (*Id.*) Schuering and Jones responded to his kites by relying on the BMI chart. (*Id.*) He avers that Dr. Koehn, Jones and Schuering failed to consider his fat content, bone mass, medical condition, body type and previous weight. (*Id.*, 6) He contends that as a result of their decisions, he suffered additional weight loss, constipation, atrophy, stomach aches, stress, anxiety, frustration, and deterioration of his health, along with emotional distress. (*Id.*)

Insofar as Count II is concerned, Plaintiff alleges that there is no difference between him and others who receive supplemental meals. (ECF No. 11 at 5.) He contends that he was required to have further weight loss to get additional portions, while other inmates only required twenty

---

[2] Identified by Plaintiff in the Amended Complaint as Ned Shearing.

[3] Identified by Plaintiff in the Amended Complaint as Chardin.

1    percent or less weight loss to receive supplemental meals. (*Id*. at 7.) Plaintiff alleges that his

2    equal protection claim is based on a "class of one," because he is singled out as an individual

3    with irrational treatment not based on a suspect classification. (*Id*.)

4          In Count III, Plaintiff alleges a supervisory liability claim against defendants Jones,

5    Garner and Schardin. (ECF No. 11 at 8.) He contends that they responded to his kites and

6    grievances but did not prevent the violation of his rights, and failed to instruct, supervise and

7    train their subordinates to ensure Plaintiff received proper medical care. (*Id*.)

8          Both Plaintiff and Defendants now move for summary judgment. (ECF Nos. 59, 61.)

9                                    **II. LEGAL STANDARD**

10         "The purpose of summary judgment is to avoid unnecessary trials when there is no

11   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

12   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

13   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

14   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

15   (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

16   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

17   Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

18   issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

19   250 (1986).

20         A party asserting that a fact cannot be or is genuinely disputed must support the
           assertion by:

21         (A) citing to particular parts of materials in the record, including depositions,
           documents, electronically stored information, affidavits or declarations,

22         stipulations (including those made for purposes of the motion only), admissions,
           interrogatory answers, or other materials; or

23         (B) showing that the materials cited do not establish the absence or presence of a
           genuine dispute, or that an adverse party cannot produce admissible evidence to

24         support the fact.

25   Fed. R. Civ. P. 56(c)(1)(A), (B).

26         If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

27   made on personal knowledge, set out facts that would be admissible in evidence, and show that

28   the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot

avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

## A. COUNT I- DELIBERATE INDIFFERENCE-DR. KOEHN, JONES, SCHEURING

### 1. Standard

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in

1    nature include "an injury that a reasonable doctor or patient would find important and worthy of

2    comment or treatment; the presence of a medical condition that significantly affects an

3    individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974

4    F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted)

5    (finding that inmate whose jaw was broken and mouth was wired shut for several months

6    demonstrated a serious medical need).

7           If the medical need is "serious," the plaintiff must show that the defendant acted with

8    deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

9    omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

10   1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

11   even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

12   under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present

13   when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

14   official must both be aware of the facts from which the inference could be drawn that a

15   substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*,

16   511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

17          Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally

18   interfere[s] with medical treatment, or it may be shown by the way in which prison officials

19   provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal

20   quotation marks and citation omitted).

21          "A difference of opinion between a physician and the prisoner—or between medical

22   professionals—concerning what medical care is appropriate does not amount to deliberate

23   indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

24   Instead, to establish deliberate indifference in the context of a difference of opinion between a

25   physician and the prisoner or between medical providers, the prisoner "'must show that the

26   course of treatment the doctors chose was medically unacceptable under the circumstances' and

27   that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

28   health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**2. Argument**

    **a. Plaintiff's Argument**

Plaintiff asserts that defendants Dr. Koehn and Schuering admit that if an inmate loses fifteen to twenty percent of his bodyweight in the span of a month, the inmate will be given double portions. (ECF No. 59 at 2-3, 6.) Plaintiff contends that it is not standard practice to place inmates on double portions when they lose fifteen to twenty percent of their body weight; therefore, Defendants deny medical care to those inmates they want to punish. (*Id*. at 6.)

Next, Plaintiff argues that Defendants' medical decisions were not informed, as Dr. Koehn admits he did not consider Plaintiff's body mass and body type. (*Id*. at 7.) Plaintiff contends that in determining how much an individual should weigh, a health care provider should look at the body type, amount of bone, muscle and fat in the body. (*Id*.) Plaintiff maintains he is a mesomorph-endomorph body type, while Defendants treated him as an ectomorph, and in not taking into account his body type, their BMI classifications of him were incomplete. (ECF No. 59 at 7.)

In support of his position, Plaintiff submits an article regarding three body types from muscleandstrength.com, stating that "[b]ody type influences how you respond to diet and training" and that understanding body type can aid in planning a muscle building training and diet program. (ECF No. 59 at 68-70.) It describes an "ectomorph" as a "typical skinny guy;" a "mesomorph" as one with "large bone structure, large muscles and a naturally athletic physique;" and an "endomorph" as a "solid and generally soft" body that gains weight easily, usually of a shorter build with thick arms and legs. (*Id*.) The article states that these body types can also be found in combination. (*Id*. at 69.)

Plaintiff also provides a BMI chart from Rush University Medical Center dated September 11, 2013, which states that a healthy weight for a male who is six feet three inches tall is between 176 and 216 pounds. (ECF No. 59 at 71.) The chart states that determining how much you should weigh "is not a simple matter of looking at an insurance height-weight chart, but includes considering the amount of bone, muscle, and fat in your body's composition. The amount of fat is the critical measurement." (*Id*. at 72.) It goes on to state: "A good indicator of

how much fat you carry is the Body Mass Index (BMI). Although it is not a perfect measure, it gives a fairly accurate assessment of how much of your body is composed of fat." (*Id.*)

Plaintiff then asserts that Defendants violated the Eighth Amendment by denying him an adequate diet. (ECF No. 59 at 9.) Plaintiff claims that the three meals provided per day give a daily calorie intake of 2500 to 2800 calories. (*Id.*) Plaintiff claims he needs 2800 calories a day to maintain continued health as a result of his illness and medications. (*Id.*) He contends that ESP's nutritional facts contain overinflated calorie and portion information. (ECF No. 59 at 10.) He claims that meals that contain meat are composed mostly of protein which does not count as calories. (*Id.*) In his declaration, he states that he disputes that inmates at ESP receive 3,000 calories a day, but he "can't support my claim w/ facts." (Pl.'s Decl., ECF No. 59 at 20.)

In support of his argument, Plaintiff provides another article stating that an average male needs 2400 to 3000 calories a day to maintain a healthy body weight. (ECF No. 59 at 76.)

Plaintiff contends that his weight loss has caused him to be unable to work out or leave his cell for the yard at times, and he exhibits symptoms of anorexia nervosa including, weighing less than eighty-five percent of his ideal body weight, low body weight, constipation, slow emptying of the stomach, feeling cold. (ECF No. 59 at 11.) Plaintiff has submitted a printout from Drugs.com regarding Prednisone, which states that a side effect includes unexplained weight loss (ECF No. 59 at 46-50), and literature on Sarcoidosis (*id.* at 61-67). He also includes a printout from WebMD regarding Anorexia Nervosa. (*Id.* at 73-75.)

As he did in his motion for preliminary injunction, Plaintiff contends that Defendants have falsified his medical records in connection with certain weight recordings. (ECF No. 59 at 13.)

Plaintiff sent a kite on February 20, 2013, stating that he had lost another ten pounds since his last chronic care appointment, down from 189 pounds. (ECF No. 59 at 22.) He stated that the hormonal imbalance caused by the cortisol he was taking resulted in a boost in his metabolism and his weight loss. (*Id.*) In response he was told by Schuering: "Seen your weight is within the limits. Kite as needed." (*Id.*)

Plaintiff sent a kite on March 4, 2013, stating that he had seen a nurse regarding his hunger and weight loss which he claimed were signs of the hormonal imbalance he referenced in the first kite. (ECF No. 59 at 23-24.) He was shown a BMI chart with his height (6'3") and weight (168 lbs.). (*Id*.) He told the nurse that his normal weight was 210 pounds, but the nurse did not listen. (*Id*.) He contended that the chart was wrong and incomplete in his case because it did not take into consideration the three different body types: (1) endomorph; (2) ectomorph; and (3) mesomorph. (*Id*.) He asserted that he was a mesomorph, as he had broad shoulders, big bones, and a stocky, wide body type. (*Id*.) In response, Jones told him that his BMI did not merit double portions at that time. (*Id*.)

On March 10, 2013, Plaintiff filed his first grievance related to these issues (grievance 20062958041). (ECF No. 59 at 25-30.) At the informal level, he stated that in 2007, Dr. Gedney diagnosed him with an over-active immune system, and he had asked for double portions at that time but was advised the prison did not give out double portions. (*Id*. at 25.) He went on to state that after several years, he discussed his weight loss with Dr. Koehn in October 2012, when his weight had dropped from 189 to 176 pounds. (*Id*. at 26.) Dr. Koehn responded: "That's just a bowel movement." (*Id*.) Plaintiff saw the doctor again in February 2013, but did not mention his weight loss. (*Id*.) A few days later, Plaintiff saw the Dr. Oz show which discussed hormonal issues and cortisol steroids. (*Id*.) Plaintiff sent a kite to Dr. Koehn discussing his weight loss, and his conclusion that it was due to increased metabolism caused by hormonal imbalance from the cortisol steroids he was on. (*Id*.) On March 1, he saw a nurse who weighed and measured him and showed him a BMI chart that did not contain the three different body types. (*Id*. at 26-27.) He advised the nurse he was a mesomorph. (*Id*. at 27.) He told the nurse that when he came to prison he weighed 210 pounds. (*Id*.) In the grievance, he claimed he had lost another four pounds from the last appointment. (*Id*.) He then referenced the second kite he wrote to nursing, describing the three body types. (*Id*. at 27-28.) He claimed that the nurses made their decision (that he was not entitled to double portions) without all of the facts (*i.e.*, his body type). (*Id*. at 28.) Next, he claimed that the prison diet consists of just 1200 calories a day, and that the prison was not providing nutritionally adequate food. (*Id*. at 29.)

He received the following response to his informal grievance from defendant Jones:

> There is no documentation in your chart regarding a overactive immune system. You lost one pound in a month according to the documentation in your chart. You do not meet the criteria for double portions at this time. I spoke with culinary and the regular diet consists of 3000 to 3200 calories a day not 1200.

(ECF No. 59 at 31.)

On April 10, 2013, he filed his first level grievance. (ECF No. 59 at 32-33.) He stated that he has sarcoidosis and had lost twenty pounds in six months, and four pounds since his last appointment. (*Id*.) He also stated that the in responding to his informal grievance, Jones did not consider that the BMI chart was incomplete because it did not address body type, so the nurses and doctor failed to use all information and denied him access to adequate medical care. (*Id*.)

He received this response from defendant Garner at the first level: "Although it appears you have had some weight loss it is not significant enough at this time to warrant 'double portions.' Your BMI is well within normal range for regular diet requirements." (ECF No. 59 at 34.)

On May 20, 2013, Plaintiff filed his second level grievance. (ECF No. 59 at 35.) He reiterated his claim that the responders had failed to consider that the BMI chart is incomplete, as it did not account for his previous weight of 210 pounds, and his body type, such that the BMI chart utilized does not apply to him. (*Id*.) Schardin denied the second level grievance, agreeing with the first level response. (*Id*. at 36.)

On October 20, 2013, Plaintiff filed his second grievance (grievance 20062969096). (ECF No. 59 at 37.) At the informal level, he claimed that his rights under the Equal Protection Clause were violated when he was denied double portions when he had lost over thirty-five pounds, while other prisoners received double portions when they lost less weight. (ECF No. 59 at 37-39.) Defendant Jones provided this response: "Mr. Dease upon review of your chart you still do not meet the criteria for double portions. I also see that you have not kited regarding your weight concerns since March of 2013." (*Id*. at 40.)

On November 26, 2013, Plaintiff filed his first level grievance. (ECF No. 59 at 41.) He stated: "I haven't mentioned my weight because I'm working on a lawsuit. See ya in court." (*Id*.) Garner responded to the first level grievance:

> You were seen in March and evaluated for this and had a BMI well above the 'low range' for weight loss. You will need to be reassessed by the provider before a change can be made- I recommend you kite the provider to be seen again and reassessed if you desire to be re-evaluated.

(*Id*. at 42.)

Plaintiff filed a second level grievance on January 23, 2014. (ECF No. 59 at 43-44.) Plaintiff claimed he was a meso-endomorph body type, and the BMI chart used by Defendants was incomplete. (*Id*.) R. Aranas denied the second level grievance, agreeing with the first response. (*Id*. at 45.)

Plaintiff filed a third grievance on December 23, 2013 (grievance 20062972190). (ECF No. 59 at 51.) In the informal level, he asserted that Dr. Koehn, Jones, Scheuring and Schardin failed to provide adequate medical care and denied him equal protection of the laws. (ECF No. 59 at 51-54.) He reiterated that the BMI chart used by Defendants did not contain body types. (*Id*. at 52.) Defendant Jones provided this response: "According to documentation in your chart you have actually gained weight. The BMI chart used by this facility has been approved by the provider." (*Id*. at 55.)

In his first level grievance on February 16, 2014, Plaintiff stated that he had lost over forty pounds, which exceeded the twenty percent requirement for getting double portions. (ECF No. 59 at 56.) He stated: "So, I'll see you in court because I don't have time for your stupid or asinine responses or no response...Your BMI chart is wrong." (*Id*.) Defendant Garner responded: "Although it appears you have had some weight loss before it is not significant and your BMI is well within the normal range for regular diet requirements." (*Id*. at 57.)

Plaintiff filed his second level grievance on April 16, 2014, stating that his BMI should not be in the normal range because he is a meso-endomorph. (*Id*. at 58.) R. Aranas denied the grievance, agreeing with the first level response. (*Id*. at 59.)

Plaintiff filed a fourth grievance on July 11, 2014 (grievance 20062982016). (ECF No. 59 at 104-105.) At the informal level (which is the only level provided), he stated that he recently saw Dr. Koehn, and showed him his exhibits, and Dr. Koehn said, "You have put on some weight, so your lawsuit is no good." (*Id*. at 104.) He claimed that Dr. Koehn falsified his medical

1   records. (*Id*.) Defendant Jones responded: "Your BMI is 25, there is no clinical indication for

2   double portions. There is no falsification of records. You do not get a choice of providers that

3   you see." (ECF No. 59 at 103.)

4          Plaintiff provides Dr. Koehn's responses to his Requests for Admissions. Dr. Koehn

5   admits that Plaintiff voiced concerns about his weight loss, and that Dr. Koehn has examined

6   Plaintiff. (ECF No. 59 at 113-114, Dr. Koehn's response to Pl.'s Request for Admission Nos. 1,

7   2.) Dr. Koehn admits that Plaintiff's bone mass and body type were not considered in his

8   decision (to deny double portions). (ECF No. 59 at 114, Dr. Koehn's response to Pl.'s Request

9   for Admission No. 3.) Dr. Koehn calculated Plaintiff's BMI on several occasions and confirmed

10  Plaintiff did not meet the criteria for double portions. (ECF No. 59 at 114, Dr. Koehn's response

11  to Pl.'s Request for Admission No. 4.) Dr. Koehn admits that if an inmate loses 15-20% of their

12  bodyweight in the span of one month's time, the inmate will be provided double portions and

13  will be admitted to the infirmary for observation. (ECF No. 59 at 114-115, Dr. Koehn's response

14  to Pl.'s Request for Admission No. 5.) Dr. Koehn admits that on May 3, 2012, Plaintiff's vitals

15  were taken and his weight was 169.6 pounds. (ECF No. 59 at 115, Dr. Koehn's response to Pl.'s

16  Request for Admission No. 6.) Dr. Koehn admits Plaintiff has not been provided double portions

17  for his weight loss. (ECF No. 59 at 115, Dr. Koehn's response to Pl.'s Request for Admission

18  No. 7.)

19         He also provides defendant Schardin's responses to his Requests for Admissions.

20  Schardin admits that he concluded Plaintiff did not meet the criteria for double portions based on

21  the recommendation of the on-site clinical staff and a calculated BMI of 20.7, which falls within

22  the normal range of 18.5 to 24.9, based on a height of six feet, three inches and a weight of 165

23  pounds. (ECF No. 59 at 120, Schardin's response to Pl.'s Request for Admission No. 4.)

24         He provides defendant Jones' responses to Plaintiff's Requests for Admissions. Jones

25  admits that Plaintiff's medical records indicate that he discussed his weight loss and was

26  examined by Dr. Koehn and Schuering. (ECF No. 59 at 124-125, Jones' responses to Pl.'s

27  Request for Admission Nos. 1, 2.) Jones admits Plaintiff did not meet the criteria for double

28  portions. (ECF No. 59 at 125, Jones' responses to Pl.'s Request for Admission No. 4.) Jones

admits that Plaintiff's records indicate that Plaintiff's weight was 169.6 pounds on May 3, 2013, and that this was the only time his weight was documented under 170 pounds. (ECF No. 59 at 126, Jones' responses to Pl.'s Request for Admission No. 6.) Finally, Jones admits Plaintiff has not been provided double portions. (ECF No. 59 at 126, Jones' responses to Pl.'s Request for Admission No. 7.)

Defendant then provides defendant Schuering's responses to Plaintiff's Requests for Admission. Defendant Schuering admits that Plaintiff discussed his weight loss, but contends there was not supporting data in his medical chart. (ECF No. 59 at 129, Schuering's response to Pl.'s Request for Admission No. 1.) Schuering admits he has taken Plaintiff's vital readings, which include height and weight. (ECF No. 59 at 129-130, Schuering's response to Pl.'s Request for Admission No. 2.) Schuering admits that based upon Plaintiff's BMI calculations by Dr. Koehn, he confirmed with Plaintiff that he did not meet the criteria for double portions. (ECF No. 59 at 130, Schuering's response to Pl.'s Request for Admission No. 4.) Schuering's understanding is that if an inmate loses fifteen to twenty percent of their body weight in the span of one month, the inmate will be provided with double portions and admitted to the infirmary for observation. (ECF No. 59 at 130-131, Schuering's response to Pl.'s Request for Admission No. 5.) Schuering admits that according to Plaintiff's chart, his vitals were taken on May 3, 2013, and his weight was 169.9 pounds. (ECF No. 59 at 131, Schuering's response to Pl.'s Request for Admission No. 6.) Schuering admits Plaintiff has not been given double portions. (ECF No. 59 at 131, Schuering's response to Pl.'s Request for Admission No. 7.)

Plaintiff submits his own declaration, stating that he weighed 239 pounds in 1999. (ECF No. 59 at 166 ¶ 3.) As of May 3, 2013, he weighed 169.6 pounds. (*Id*.) On May 9, 2014, Plaintiff was weighed and staff reported his weight as 202.8 pounds. (*Id*. ¶ 4.) Plaintiff asserts that Dr. Koehn falsified his medical records. (*Id*.) He says that a picture of him contradicts this, and that at that time he weighed between 169.6 and 172.4 pounds. (*Id*., citing medical records of November 1, 2013 and May 3, 2013.) He was weighed on July 12, 2015, and weighed 177 pounds.

1    Plaintiff states that he uses a cortical steroid to control his extreme allergies, and this

2  tends to increase his metabolism. (*Id.* at 167 ¶ 6.) As a result, he needs to consume more food.

3  (*Id.*)

4    Plaintiff submits various medical records, and insofar as they are relevant to this case,

5  they reveal the following:

6    At his physical examination in 1999, Plaintiff weighed 239 pounds. (ECF No. 66 at 34.)

7  At his physical examination in 2002, it was noted that Plaintiff weighed 219 pounds. (ECF No.

8  66 at 32.)

9    An October 10, 2006 record notes sarcoidosis. (ECF No. 66 at 3.) He was referred to a

10  pulmonologist for evaluation of possible sarcoidosis with complaints of cough and weight loss

11  on October 12, 2006. (*Id.* at 8.) As of November 1, 2006, his weight was reported at 188 pounds,

12  with a height of six feet, two inches. (*Id.* at 17.) It was noted that in June 2006, he weighed 195

13  pounds, and in 1984 his weight was 209 pounds. (*Id.*) It was suspected he had sarcoidosis at that

14  time. (*Id.* at 18.)

15    At an annual physical examination in 2007, it was noted that Plaintiff was six feet, three

16  inches tall and weighed 198 pounds. (*Id.* at 30.)

17    Records from 2008, indicate Plaintiff was six feet, two inches tall, and weighed 220

18  pounds. (*Id.* at 37.)

19    He was enrolled in the chronic disease clinic in 2011 due to his sarcoidosis. (*Id.* at 4.)

20  At an August 26, 2011 physical examination, Plaintiff was recorded as being six feet, two inches

21  tall, and weighing 201.6 pounds. (*Id.* at 29.) Records from a physical examination on August 24,

22  2012, indicate his height was six feet, three inches, and he weighed 185 pounds. (*Id.* at 28.)

23    Plaintiff refused a periodic examination August 16, 2013, and a physical examination on

24  August 22, 2014. (*Id.* at 25-26.)

25    **b. Defendants' Argument**

26    According to Defendants, the BMI calculation is a generally accepted method of

27  screening an individual for a weight category, for example: underweight, normal/healthy weight,

28  overweight, and obese. (Dr. Koehn Decl., ECF No. 62-1 ¶ 13.) BMI calculators can be found on

the National Institute of Health (NIH) and the Centers for Disease Control (CDC) websites, and are generally accepted in the medical community as a means to determine the weight category of an individual. (*Id.* ¶ 14; ECF No. 62-2.) BMI is a primary factor, along with the acuteness or speed of weight loss, in determining if an ESP inmate needs to be placed on a double portion diet. (*Id.* ¶ 15.) According to the NIH and CDC, and individual is not considered underweight until the BMI falls below 18.5. (ECF No. 61 at 4; Dr. Koehn Decl., ECF No. 62-1 ¶ 17.) Inmates at ESP are not placed on double portion diets for weight loss related issues unless their BMI is below 19 and trending toward 18. (*Id.* ¶ 17.)

Defendants assert that as of the time they filed their motion, Plaintiff's last recorded weight was on July 16, 2015, when he weighed 174 pounds. (ECF No. 61 at 3; ECF No. 62-2; Dr. Koehn Decl., ECF No. 62-1 ¶ 11.)[4] This corresponds to a BMI calculation of 21.7, which is within the normal/healthy weight range for a male who is six feet, three inches tall. (ECF No. 61 at 3; Dr. Koehn Decl., ECF No. 62-1 ¶¶ 12, 19; ECF No. 62-2.) Plaintiff's lowest recorded weight from September 2011 to July 2015 was 169.6 pounds, which corresponds to a BMI of 21.2, which is also within the normal/healthy weight range for Plaintiff. (ECF No. 61 at 4; ECF No. 62-2; Dr. Koehn Decl., ECF No. 62-1 ¶ 18.) Plaintiff's medical records do not reflect a weight was recorded that would classify him as underweight. (ECF No. 61 at 4; Dr. Koehn Decl., ECF No. 62-1 ¶¶ 11, 18.) While Plaintiff's weight fluctuated over the past few years, he did not experience an acute or abrupt loss of weight which would reflect a potential health problem. (Dr. Koehn Decl., ¶ 21.) In response to Plaintiff's motion, Defendants assert that Plaintiff has not demonstrated that he ever lost fifteen to twenty percent of his body weight within the span of a month. (ECF No. 65 at 1.)

---

[4] Plaintiff's medical records reveal the following recorded weights: (1) 1999-239 lbs.; (2) 2002-219 lbs.; (3) June 2006-195 lbs; (4) November 1, 2006-188 pounds; (5) 2007-198 lbs.; (6) 2008-220 lbs;  (7) April 9, 2011-198.2 lbs; (8) August 26, 2011-201.6 lbs; (9) September 9, 2011-198.2 lbs; (10) December 10, 2011-195 lbs; (11) May 4, 2012-193 lbs; (12) August 24, 2012-185 lbs; (13) November 16, 2012-180.8 lbs; (14) February 1, 2013-176 lbs; (15) May 3, 2013-169.6 lbs; (16) November 1, 2013-172.4 lbs; (17) May 9, 2014-202.8 lbs; (18) July 12, 2015-177 lbs; (19) July 16, 2015-174.6 lbs. (ECF No. 62-3; 62-4 at , 25; ECF No. 62-5 at 4, 5; Dr. Koehn Decl., ECF No. 62-1 ¶ 11; ECF No. 66 at 17, 18, 30, 34, 37.)

1    Defendants have confirmed with a licensed dietician that the meals served at ESP

2    between October 4, 2014 and October 31, 2014, as an example, were nutritionally adequate for

3    an individual with almost identical age, height and weight as Plaintiff. (ECF No. 61 at 4, 6; ECF

4    No. 65 at 3; ECF No. 62-7.) While Plaintiff provides copies of nutrition facts from various items

5    (ECF No. 59 at 97), he includes no evidence that these were part of the ESP October 2014 menu

6    or that he is not receiving adequate nutrition. (*Id*.) Defendants also state that the photographs of

7    Plaintiff, from 1995 where he claims to have weighed 220 pounds, and in May 2014, do not

8    demonstrate he was deprived of adequate nutrition. (*Id*. at 4.)

9    Plaintiff refused to be treated or have his vital signs taken, including his weight, on

10    dozens of occasions between August 2011 and July 2015. (ECF No. 61 at 4; Dr. Koehn Decl. ¶¶

11    27, 29; ECF No. 62-4; Ex. E.)[5]

12    **3. Analysis**

13    In essence, Plaintiff argues that Defendants were deliberately indifferent when they

14    denied him double portions in connection with his weight loss, and that they failed to provide

15    him with a nutritionally adequate diet.

16    The court finds that there is no evidence in the record to support Plaintiff's claims that he

17    suffered from a serious medical need in terms of his weight loss, or that Defendants knew of and

18    disregarded an excessive risk to Plaintiff's health in denying him double portions or with respect

19    to the nutritional adequacy of the food he was receiving at ESP.

20    Plaintiff's amended complaint alleges that he began to experience weight loss in August

21    2012. He did not send a kite about this issue until February 20, 2013, when Plaintiff's BMI was

22

23    [5] Plaintiff's medical records demonstrate that he refused to have his vitals taken on February 14, 15, 17, 25,

24    28 (refused weight), 29, 2015; March 2, 4, 5, 6, 10, 11, 13, 15, 16, 23, 25, 28, 2015; April 4, 6, 13, 17, 20, 26, 27, 28, 2015; May 1, 3, 4, 5, 7, 10, 11, 17, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31,  2015; June 2, 3, 5, 6, 7, 8, 14, 15, 16,

25    18, 19, 21, 22, 23, 25, 26, 27, 28, 2015; July 3, 4, 5, 6, 7, 9, 10, 11, 14, 2015, September 8, 2015. (ECF No. 62-4; ECF No. 62-6.) He refused to be seen for sick call on  February 19, 2015; March 9, 12, 19, 26, 2015; April 2, 10, 16,

26    21, 23, 30, 2015, May 21, 2015; June 4, 25, 2015. (ECF No. 62-4; ECF No. 62-6.) He refused to be seen at the chronic care clinic on February 3, 2012; August 3, 2012; August 9, 16, 2013; December 23, 2013; January 12, 2014;

27    August 1, 2014; November 7, 2014; February 2, 13, 2015; March 26, 2015; April 10, 30, 2015; May 14, 21, 28, 2015, June 11, 2014. (ECF No. 62-4; ECF No. 62-6.) He refused his physical examination on August 16, 2013, and

28    August 22, 2014. (ECF No. 62-4; ECF No. 62-5; ECF No. 62-6.) He refused admission to the infirmary on February 13, 2015. (ECF No. 62-4; ECF No. 62-6.) He refused an infirmary appointment with his physician on May 14, 2015, June 11, 2015, July 6, 2015. (ECF No. 62-6 at 4; ECF No. 62-6.)

1  calculated according to the BMI index utilized by the NIH and CDC, and defendant Scheuring

2  told Plaintiff his weight was within normal limits. Plaintiff sent a second kite on March 4, 2013,

3  discussing what he perceived as his hormonal imbalance, and his contention that the BMI index

4  utilized by ESP medical staff was incomplete because it did not take account of Plaintiff's body

5  type. Plaintiff was once again told that his weight did not merit double portions. According to the

6  record, Plaintiff sent no further kites on this issue, but proceeded in filing a series of grievances

7  asserting that he was not receiving an adequate amount of calories and that the BMI utilized by

8  ESP was incomplete because it did not take into account his body type.

9         Defendants utilize the BMI index found on the NIH and CDC websites, which is

10 generally accepted in the medical community as a means to determine the weight category of

11 individuals, to calculate BMI. BMI, along with the acuteness or speed of weight loss, are used to

12 determine if an ESP inmate needs to be placed on a double portion diet. According to the NIH

13 and CDC, an individual is not considered underweight until his BMI falls below 18.5. In

14 addition, Dr. Koehn admits that if an inmate loses fifteen to twenty percent of his body weight in

15 the span of one month, he will be placed on double portions and admitted to the infirmary.

16         On December 10, 2011 (which is before he asserts he began to lose weight and

17 before he alerted Defendants to any weight loss), Plaintiff weighed 195 pounds. On May 4, 2012,

18 the next time his weight was recorded, approximately five months later, he weighed 195 pounds.

19 Between May 4, 2012 and August 24, 2012, a span of approximately three and a half months, his

20 weight went from 193 pounds to 185 pounds (a loss of eight pounds, or 4.15% of his prior

21 weight). From August 24, 2012 until November 16, 2012, a span of approximately three months,

22 his weight went from 185 pounds to 180.8 pounds ( a loss of 4.2 pounds, or 2.27% of his prior

23 weight). From November 16, 2012 until the next time his weight was recorded, on February 1,

24 2013, a span of approximately two and a half months, his weight went from 180.8 pounds to 176

25 pounds (a loss of 4.8 pounds, or 2.65% of his prior weight). At this point he had not yet kited to

26 medical about his weight loss.

27         Between February 1, 2013 and May 3, 2013, a span of about three months, his weight

28 went from 176 pounds to 169.6 pounds (a loss of 6.4 pounds, or 3.64% of his prior weight).

- 17 -

1   From May 3, 2013 to November 1, 2013, a span of approximately six months, Plaintiff's weight

2   went from 169.6 pounds to 172.4 pounds (a gain of 2.8 pounds). From November 1, 2013 until

3   May 9, 2014, a span of over six months, Plaintiff's weight went from 172.4 pounds to 202.8

4   pounds (a gain of 30.4 pounds). From May 9, 2014 to July 12, 2015, a span of about fourteen

5   months, Plaintiff's weight went from 202.8 pounds to 177 pounds (a loss of 25.8 pounds, or

6   12.72% of his prior weight, but over fourteen months ). In the four days between July 12, 2015

7   and July 16, 2015, Plaintiff lost 2.4 pounds. (ECF No. 62-3; 62-4; ECF No. 62-5 at 4, 5;

8   Dr. Koehn Decl., ECF No. 62-1 ¶ 11; ECF No. 66 at 17, 18, 30, 34, 37.)

9          Plaintiff's BMI, as assessed by the CDC and NIH BMI index, never fell below 20 given

10  the recorded weights. At his lowest recorded weight of 169.6 pounds, his BMI was 21.2. As

11  Dr. Koehn points out, Plaintiff's weight certainly fluctuated between 2011 and 2015, but there

12  was never an acute or abrupt loss of weight, reflecting a potential health problem. In addition, as

13  the data above reflects, Plaintiff never lost fifteen to twenty percent of his body weight in the

14  span of a month.

15         Plaintiff disputes that he weighed 202.8 pounds on May 9, 2014, but provides no

16  evidence to demonstrate what he believes he actually weighed on that date. He provides a

17  photograph from 1995 and a photograph from May 2014. While there is certainly a difference in

18  appearance between the photographs, the court cannot discern what Plaintiff's weight was in

19  May 2014 from the photographs, and the lapse of time between the photographs is nineteen

20  years. In other words, the court cannot ascertain from the photographs whether Plaintiff weighed

21  202 pounds in the 2014 photograph, or a lesser amount.

22         Plaintiff also points to medical records from November 1, 2013 and May 3, 2014 (ECF

23  No. 59 at 166 ¶ 4), in support of his claim that he did not weigh 202 pounds in May 2014. On

24  May 3, 2013 Plaintiff weighed 169.6 pounds. On November 1, 2013, he weighed 172.4 pounds.

25  These weight records do not provide any evidence that Plaintiff did not weigh 202 pounds in

26  May of 2014, over a year after the May 2013 weight record, and six months after the November

27  2013 weight record.

28

Plaintiff contends that he has raised a genuine dispute of material fact as to whether Defendants were deliberately indifferent to his serious medical needs because it is his position that the BMI index utilized by Defendants is incomplete because it did not take into account his body type, among other criteria. To support this argument, he submits an article from muscleandstrength.com and a BMI chart from Rush University. The article from muscleandstrength.com clearly discusses ideal body weight for *planning a muscle building, strength training and diet program*. There is no evidence in the record that this method is generally accepted, let alone utilized, by the medical community.

Defendants, on the other hand, have submitted the declaration of Dr. Koehn, which states that the BMI index from the NIH and CDC are generally accepted in the medical community. Plaintiff's reference to this article concerning a muscle building, strength training and diet program does not create a genuine dispute of material fact as to whether Defendants were deliberately indifferent. Nor does the BMI chart from Rush University. That chart states that the healthy weight for a male that is 6'3" tall is 176 to 216 pounds. This chart differs from the NIH and CDC BMI index utilized by Defendants, but there is nothing in the record to establish that this chart is generally accepted in the medical community. Moreover, this chart would simply demonstrate a difference of opinion regarding the BMI index utilized by Defendants.

For a difference of opinion to amount to deliberate indifference, Plaintiff must show that the course of treatment chosen by Defendants (in this case, use of the NIH and CDC BMI index) was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Plaintiff's health. The court cannot conclude that Defendants' use of a BMI index that is generally accepted by the medical community as appropriate was medically unacceptable under the circumstances. Nor is there any evidence that the decision to utilize this BMI index was in conscious disregard to an excessive risk to Plaintiff's health. As will be discussed, *infra*, while Plaintiff claims that he was experiencing symptoms of anorexia nervosa as a result of his weight loss and inadequate diet, there is no evidence of this in his medical records or other evidence that Defendants knew Plaintiff was experiencing such symptoms.

To the extent Plaintiff argues that it is not standard practice for Defendants to place inmates on double portions when they lose fifteen to twenty percent of their body weight, he has provided no evidence to substantiate this claim. Dr. Koehn did not say that an inmate will be placed on double portions if there is fifteen to twenty percent loss of body weight. Instead, he said that such a loss had to occur within the span of a month and then an inmate would receive double portions and be placed in the infirmary for observation. As indicated above, the evidence in any event does not demonstrate that Plaintiff lost fifteen to twenty percent of his body weight in the span of a month warranting double portions.

Insofar as Plaintiff argues that he has suffered from symptoms of anorexia nervosa as a result of the denial of double portions and inadequate diet, this claim is likewise unsubstantiated by the record. To be deliberately indifferent to a plaintiff's serious medical needs, a defendant must have *known* about and disregarded an excessive risk to the plaintiff's health. First, there is no medical diagnosis of anorexia nervosa in Plaintiff's medical records. Second, there is no evidence that Defendants were put on notice by Plaintiff that he claimed to be experiencing such symptoms.

The court will now address Plaintiff's argument that Defendants were deliberately indifferent to his serious medical needs because he was not receiving a nutritionally adequate diet.

Defendants have submitted evidence that a licensed dietician, Mary Agnes Boni, MPH, RDN, LD,  reviewed a sample of ESP's menus from October 4, 2014, and October 31, 2014, and found they were nutritionally adequate for an individual with almost identical age, height and weight as Plaintiff. She states that a male of Plaintiff's approximate age and height, with a low activity level (30-60 minutes per day), should receive approximately 2466 calories per day to maintain current weight, and ESP's menus meet this criteria. In fact, Ms. Boni states that this person should probably receive fewer calories than what is being served.

In support of Plaintiff's argument that he is not receiving a nutritionally adequate diet at ESP, Plaintiff cites an article that the average male needs 2400 to 3000 calories a day. This is

1  actually consistent with Ms. Boni's finding that Plaintiff would need 2466 calories per day, and

2  that he is actually receiving more than that.

3       In addition, Plaintiff asserts that ESP's calorie counts are overinflated. In support of this

4  argument, he submits photocopies of the nutritional facts of several food items. There is no

5  declaration regarding when these items were served or what other items Plaintiff received the

6  day these items were served so as to refute Defendants' evidence that Plaintiff is receiving a

7  nutritionally adequate diet at ESP in terms of daily calorie intake.

8       In sum, the evidence in the record does not establish that Plaintiff suffered from a serious

9  medical condition, and even if he did, that Defendants knew of and disregarded an excessive risk

10 to his health. As a result, Plaintiff's motion for summary judgment should be denied as to the

11 Eighth Amendment claim in Count I, and Defendants' cross-motion should be granted.

12 **B. COUNT II- EQUAL PROTECTION- JONES, DR. KOEHN, SCHEURING,**

13 **SCHARDIN**

14      **1. Standard**

15      The Fourteenth Amendment prohibits the denial of "the equal protection of the laws."

16 U.S. Const.  amend XIV, § 1. It "commands that no State shall deny to any person within its

17 jurisdiction the equal protection of the laws, which is essentially a direction that all persons

18 similarly situated should be treated alike." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.

19 2001) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

20   "The Equal Protection Clause requires the State to treat all similarly situated people equally."

21 *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting *Shakur v. Schriro*, 514 F.3d

22 878, 891 (9th Cir. 2008) (internal quotation marks omitted)). "Although the Equal Protection

23 Clause ensures similarly situated persons are treated alike, it does not ensure absolute equality."

24 *Bruce v.  Ylst*, 351 F.3d 1283, 1288 (9th Cir.  2003) (citation omitted).

25      Under section 1983, an inmate Plaintiff must present evidence of an intent to discriminate

26 against the plaintiff based upon his membership in a protected class. *See Washington v.  Davis*,

27 426 U.S. 229, 239-40 (1976); *Serrano v.  Francis*, 345 F.3d 1071, 1082 (9th Cir.  2003); *Lee v.*

28 *City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.  2001) (citation omitted).  "Intentional

discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Serrano*, 345 F.3d at 1082 (citation omitted). A plaintiff's speculation of discriminatory intent is insufficient to raise a triable issue of material fact. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation omitted); *see also Champion v. Murphy*, 643 F.Supp.2d 1171 (C.D. Cal. 2009)(court found "Plaintiff's speculation that Defendant's allegedly improper dental care or Defendant's alleged 'smirks' and 'smugness' were the product of discriminatory intent" were not sufficient to raise triable issue).

Where state action "does not implicate a fundamental right or suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). Thus, the defendant need only articulate a legitimate governmental interest that is rationally related to its policy. *See, e.g., McGinnis v. Royster*, 410 U.S. 263 (1973).

## 2. Argument

### a. Plaintiff's Argument

Plaintiff contends that Defendants' actions were motivated by a "spiteful effort" to get him. (ECF No. 59 at 12.) He claims he was treated differently than others similarly situated to him, with no rational basis for the difference in treatment. (*Id.*) Plaintiff states that Defendants demanded forty percent weight loss of him as a condition for getting double portions, when the rules only require a fifteen to twenty percent weight loss. (*Id.* at 12-14, Ex. A, B, C, D, F, N, P, App. B Ex. 1.)

Plaintiff submits the declaration of inmate Alfonso Jackson. (ECF No. 59 at 79-80) He states that Plaintiff has been denied extra portions. (*Id.*) He believes Plaintiff's weight is below 200 pounds, and in the past dropped to 170 pounds. (*Id.*) Mr. Jackson also lost a lot of weight (from 230 to 205 pounds), but was ordered double portions by his mental health provider and now weighs over 250 pounds. (*Id.*)

1    He also provides the declaration of inmate Justin Tyler Mendoza, who states that in

2  February, pursuant to his psychologist's recommendation, Dr. Koehn gave him double portions

3  because his psychotropic medications were increasing his hunger. (ECF No. 59 at 95-96.)

4    **b. Defendants' Argument**

5    Defendants' argue that their decision not to place Plaintiff on a double portion diet was

6  based on his BMI calculation, which is purely objective, and they did not discriminate against

7  Plaintiff. (ECF No. 61 at 4; Dr. Koehn Decl., ECF No. 62-1 ¶¶ 15, 20.)

8    In response to Plaintiff's motion and in support of their cross-motion, Defendants argue

9  that the declarations of Mr. Jackson and Mr. Mendoza do not demonstrate discrimination against

10 Plaintiff. (ECF No. 65 at 4; ECF No. 61 at 10.) Instead, those inmates received double portions

11 on the basis of mental health conditions, so they are not comparable to Plaintiff. (*Id.*; Dr. Koehn

12 Decl., ECF No. 62-1 ¶¶ 22-24.)

13    The fact that Plaintiff is taking Prednisone, which can include a side effect of

14 unexplained weight loss, does not demonstrate that Plaintiff was denied double portions in order

15 to discriminate against him. (ECF No. 65 at 10.)

16    Defendants also argue that Plaintiff's application of the class-of-one theory is misguided.

17 (*Id.* at 5; ECF No. 61 at 8-9.) In any event, Defendants assert that the decision to not place

18 Plaintiff on double portions is objective, and there is a rational and penologically valid reason for

19 preventing inmates who do not medically require double portions from obtaining them (*i.e.*, to

20 prevent inmates from trading food as a means of currency). (ECF No. 65 at 6; ECF No. 61 at 9;

21 Dr. Koehn Decl., ECF No. 62-1 ¶¶ 15, 25.)

22    **3. Analysis**

23    Assuming that Plaintiff's "class of one" theory is viable, Defendants have produced

24 evidence that Plaintiff was denied double portions based solely on the objective finding that his

25 BMI was within the healthy/normal range. Neither Plaintiff's own motion, nor his response to

26 Defendants' motion, contain evidence that similarly situated individuals were intentionally

27 treated differently. Plaintiff relies on the affidavits of Mr. Mendoza and Mr. Jackson as such

28 proof, but their declarations do not demonstrate that the inmates are similarly situated.

Mr. Mendoza and Mr. Jackson were both provided double portions upon the recommendation of their mental health care providers. There is no evidence that they were given double portions simply because they experienced weight loss similar to Plaintiff's. Mr. Jackson states that he lost twenty-five pounds, but does not discuss the time period over which he lost that weight, so as to demonstrate his weight loss was similar to Plaintiff's. Mr. Mendoza simply states that he was put on double portions by his mental health provider because his mental health medications were causing him to be hungry, but provides no information regarding his weight loss so as to compare it to Plaintiff's.

Insofar as Plaintiff contends that Defendants discriminated against him because they demanded forty percent weight loss as a condition for obtaining double portions, when other inmates only required fifteen to twenty percent weight loss, the court finds this to be unsubstantiated by the record. There is no evidence that Defendants required Plaintiff to achieve forty percent weight loss to obtain double portions. According to Dr. Koehn, inmates at ESP are not placed on double portion meal diets for weight loss issues unless their BMI is below 19 and trending toward 18. Plaintiff's BMI never fell below 20. Dr. Koehn admits in discovery that if an inmate loses 15-20% of their bodyweight in the span of one month's time, the inmate will be provided double portions and will be admitted to the infirmary for observation. There is no evidence, however, that Plaintiff lost fifteen to twenty percent of his body weight in the span of a month, or that Defendants required that he lose forty percent of his body weight to obtain double portions. (ECF No. 62-3; 62-4 at , 25; ECF No. 62-5 at 4, 5; Dr. Koehn Decl., ECF No. 62-1 ¶ 11; ECF No. 66 at 17, 18, 30, 34, 37; *see supra*, n. 4.)

In sum, the court finds that Defendants have met their burden of producing evidence to demonstrate that Plaintiff was not discriminated against when he was denied double portions. Plaintiff, on the other hand, has not submitted evidence to meet his burden on summary judgment or to raise a genuine dispute of material fact in response to Defendants' motion. As a result, Defendants cross-motion should be granted as to the equal protection claim in Count II, and Plaintiff's motion should be denied as to this claim.

///

1 **C. COUNT III- SUPERVISORY LIABILITY- JONES, SCHARDIN, GARNER**

2       Plaintiff argues that Jones, Garner and Schardin became responsible for the denial of

3 medical and violation of the Equal Protection Clause when they failed to correct that conduct in

4 the course of their supervisory responsibilities. (ECF NO. 59 at 15.) He claims that they knew he

5 faced a substantial risk of serious harm through his kites and grievances, and they failed to

6 investigate and denied his requests. (*Id*. at 15-16; Ex. B, C, D, F.)

7       In their response to Plaintiff's motion, Defendants assert that Plaintiff's own evidence

8 reveals that Jones, Schardin and Garner did not perceive a significant risk to Plaintiff's health or

9 safety regarding his weight loss. (ECF No. 65 at 6.) They used an objective criteria to evaluate

10 Plaintiff's BMI using his height and weight in responding to the grievances. (*Id*. at 7.) There is

11 no indication Jones, Garner or Schardin were personally involved in anything other than an

12 objective evaluation of Plaintiff's disputed BMI. (ECF No. 61 at 4; ECF No. 65 at 11.)

13       As the court has found no evidence of any underlying constitutional violation the motion

14 for summary judgment of defendants Jones, Schardin and Garner should be granted, while

15 Plaintiff's motion should be denied as to the supervisory liability claims in Count III.

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** Plaintiff's Motion for Summary Judgment (ECF No. 59) and **GRANTING** Defendants' Cross-Motion for Summary Judgment (ECF No. 61).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: December 31, 2015.

William G. Cobb
_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

- 26 -